S1
A-C.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY SERVICES, INC.,

        Plaintiff,

v.

NED NORETTO,

        Defendant.

Case: 4:07-cv-12389
Assigned To: Gadola, Paul V
Referral Judge: Morgan, Virginia M
Filed: 06-04-2007 At 03:55 PM
CMP KELLY SERVICES V. NORETTO (DA)

BUTZEL LONG
By: James J. Giszczak (P46917)
     Katherine D. Goudie (P62806)
150 West Jefferson, Suite 100
Detroit, MI 48226
(313) 983-7475
Attorneys for Plaintiff

## PLAINTIFF KELLY SERVICES, INC.'S MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, Plaintiff Kelly Services, Inc. ("Kelly") moves this Court for a Temporary Restraining Order and a Preliminary Injunction. Defendant Ned Noretto ("Noretto") has accepted employment with a direct competitor, Volt Information Sciences, Inc., or a related Volt entity (hereinafter collectively referred to as "Volt"), in violation of his non-competition, non-solicitation, and non-disclosure agreement with Kelly. While employed with Kelly, Noretto served as Kelly's Regional Manager of Major Markets and worked with Kelly's most confidential information, trade secrets, and two of Kelly's largest customer accounts.

Noretto's employment with Volt has, or inevitably will, result in the misappropriation and misuse of Kelly's confidential and proprietary business information.

The wrongful acts of Noretto have been calculated and designed to undercut and irreparably harm Kelly's competitive position and customer goodwill.   Accordingly, Kelly has no option but to seek injunctive relief from this Court in an effort to protect its contractual interests, its confidential and proprietary business information, and trade secrets, as well as its customer relationships and goodwill.   Because Kelly has no adequate remedy at law for its injuries, which will continue and be aggravated in the future unless Noretto is restrained, Kelly is entitled to a temporary restraining order and preliminary injunction to prevent further harm.

Respectfully submitted,

BUTZEL LONG

By:_____
      James J. Giszczak (P46917)
      Katherine D. Goudie (P62806)
150 West Jefferson, Suite 100
Detroit, Michigan 48226
(313) 983-7475
E-mail: giszczak@butzel.com
          goudie@butzel.com
Dated:   June 4, 2007                   Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY SERVICES, INC..,

       Plaintiff,

                                 Case No. 07-_____

v.

                                 Hon. ___ _____

NED NORETTO,

       Defendant.

BUTZEL LONG
By: James J. Giszczak (P46917)
     Katherine D. Goudie (P62806)
150 West Jefferson, Suite 100
Detroit, MI 48226
(313) 983-7475
Attorneys for Plaintiff

**PLAINTIFF KELLY SERVICES, INC.'S BRIEF IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

Controlling or Most Appropriate Authority.................................................................iv-v

Question Presented.......................................................................................................vi

Introduction................................................................................................................1

II. Statement of Facts...................................................................................................1

    A.    Noretto's Employment with Kelly........................................................1

        1.    Noretto's Position as Regional Manager for Major Markets...............1

        2.    Noretto's Execution of his Non-Compete, Non-Solicit and Confidentiality Agreement...................................................................2

        3.    Noretto's Access to and Knowledge of Kelly's Trade Secrets............3

    B.    Noretto's Resignation from Kelly and Employment with Volt.......................4

    C.    Irreparable Harm to Kelly.......................................................................5

Argument        .............................................................................................5

I.    This Court Should Grant a Preliminary Injunction Restraining and Enjoining Noretto's Unlawful Conduct.............................................................5

    A.    Kelly Will Prevail on the Merits...................................................................6

        1.    Noretto has Breached his Enforceable Agreement with Kelly............6

            a.  The Agreement Protects Kelly's Legitimate Business Interests...........................................................................7

            b.  The Restrictions in the Agreement are Reasonably Tailored to Protect Kelly...............................................................8

            c.  Noretto has Blatantly Violated his Reasonable Agreement.................................................................................10

        2.    Noretto has Violated the Michigan Uniform Trade Secret Act.........11

    B.    If Preliminary Injunctive Relief is not Granted, Kelly Will Suffer

Irreparable Injury ..................................................................................... 13

C.    The Harm to Kelly if a Preliminary Injunction is Denied Outweighs the
      Harm to Noretto if it is Granted................................................................ 15

D.    The Public Interest Supports the Issuance of a Preliminary Injunction......... 15

Conclusion         ..................................................................................................... 16

# <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

**Cases:**

*Ainsworth v. Hunting & Fishing Club,*
    153 Mich. 185; 116 N.W. 99 (1908)...........................................................................14

*Basicomputer Corp. v. Scott,*
    973 F.2d 507 (6th Cir. 1992) ....................................................................................15

*Bristol Window & Door, Inc. v. Hoogenstyn,*
    250 Mich. App. 478; 650 N.W.2d 670 (2002)............................................................8

*Chemtrend Inc. v. McCarthy,*
    780 F. Supp. 463 (E.D. Mich. 1991)........................................................................15

*In re DeLorean Motors, Co.,*
    755 F.2d 1223 (6th Cir. 1985) ...............................................................................5, 6

*Detroit v. Salaried Phys. UAW,*
    165 Mich. App. 142; 418 N.W.2d 679 (1987).........................................................16

*Frisch's Restaurants, Inc. v. Shoney's, Inc.,*
    759 F.2d 1261 (6th Cir. 1985) ..................................................................................6

*Frontier Corp. v. Telco Comm. Group, Inc.,*
    965 F. Supp. 1200 (S.D. Ind. 1997)..........................................................................9

*La Calhene, Inc. v. Spolyar,*
    938 F. Supp. 523 (W.D. Wis. 1996) ........................................................................11

*Little Caesar Enterprises v. R-J-L Foods,*
    796 F. Supp. 1026 (E.D. Mich. 1992)........................................................................6

*Lowry Computer Products, Inc. v Head,*
    984 F. Supp. 1111 (E.D. Mich 1997)...........................................................6, 7, 8, 14

*Merrill Lynch, Inc. v. Gall,*
    836 F. Supp. 428 (W.E. Mich. 1993).........................................................................7

*Merrill Lynch, Inc. v. Ran,*
    67 F. Supp. 2d 764 (E.D. Mich. 1999)..................................................................7, 11

*Morlife v. Perry,*
    56 Cal. App. 4th 1514, 1521; 66 Cal. Rptr. 2d 731 (1997)........................................11

*Pepsico Inc. v. Redmond,*
    54 F.3d 1262 (7th Cir. 1995)..................................................................... 11, 12

*Rehmann, Robson & Co. v. McMahan,*
    187 Mich. App. 36; 466 NW.2d 325 (1991)............................................ 7, 10

*Superior Consultant Co., Inc. v. Walling,*
    851 F. Supp. 839 (E.D. Mich. 1994)............................................ 7, 9, 14, 15

*Uncle B's Bakery, Inc. v. O'Rourke,*
    920 F. Supp. 1405 (N.D. Iowa 1996)................................................... 12

*University of Texas v Camenisch,*
    451 U.S. 390 (1981)................................................................................... 5

**Statutes:**

M.C.L. § 445, 774a ................................................................................... 10
M.C.L. § 445.1901 ................................................................................... 11
M.C.L. § 445.1903(1) ............................................................................... 11

**Court Rules:**

Fed. R. Civ. P. 65

## **QUESTION PRESENTED**

Should this Court temporarily and preliminarily enjoin Defendant Ned Noretto from competing with Plaintiff Kelly Services and from soliciting Kelly Services' customers when Noretto's employment with Kelly Services' direct competitor, Volt, results in Noretto's breach of his non-competition, non-solicitation, and non-disclosure agreement, and a breach of fiduciary obligations and will result in the misappropriation and misuse of Kelly Services' confidential information and trade secrets?

Plaintiff Kelly Services answers:     Yes

## I.  INTRODUCTION

Plaintiff Kelly Services, Inc. ("Kelly") is a staffing services company that specializes in providing a wide range of employment staffing and consulting services, including, but not limited to, outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, vendor on-site and full-time placement, and consulting services.  Kelly employed Defendant Ned Noretto as a Regional Manager for the Major Markets Division to work out of Kelly's Portland, Oregon Branch.  Noretto executed an employment agreement, which prohibited him, for a period of one year after leaving Kelly's employment, from a number of activities related to Kelly's employees and customers and work with a competitor.

Kelly has recently discovered that since Noretto's departure from Kelly, he is working for a direct competitor, Volt Information Sciences, Inc., or a related Volt entity (hereinafter collectively referred to as "Volt"), in the same market area he worked for Kelly, and he is working with one of Kelly's customer that he had extensive contact with while employed with Kelly – all in direct violation of his agreement.  During Noretto's employment with Volt, he has, or inevitably will, misappropriate and misuse Kelly's confidential information and trade secrets.

Therefore, Kelly requests that this Court enter a preliminary injunction against Noretto to prohibit his unlawful conduct and to protect Kelly from suffering further irreparable harm.

## II.  STATEMENT OF FACTS

**A.**  **Noretto's Employment with Kelly**

**1.**  **Noretto's Position as Regional Manager for Major Markets**

Kelly is a staffing services company that specializes in providing a wide range of employment staffing and consulting services, including, but not limited to outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, vendor on-site and full-time placement, and consulting services. (Verified Complaint, ¶ 6.)

Noretto was employed with Kelly from January 28, 2002 through May 4, 2007. (*Id.* at ¶ 7.) Noretto worked as Kelly's Regional Manager for the Major Markets Division. He worked out of Kelly's Portland, Oregon Branch, and his market area in which he worked or had responsibilities for Kelly included Multnomah, Clackamas, Washington, Columbia, Clatsop, Marion, Yamhill, Linn, Tillamook, Lincoln and Wasco Counties, in the State of Oregon and Clark, Skamania, and Cowlitz Counties, in the State of Washington. (*Id.* at ¶ 8.) Noretto reported directly to the Division Manager for the Major Markets - West, Kristin Supancich and then Sheen Watkins, who were both located in Troy, Michigan at Kelly's headquarters. (*Id.* at ¶ 9.)

2.  **Noretto's Execution of His Non-Compete, Non-Solicit, and Confidentiality Agreement**

At the time he began his employment with Kelly, and in consideration for that employment, Noretto executed an Agreement with Full Time Employees of Kelly Corporations ("Agreement") with Kelly. A true and accurate copy of Noretto's Agreement is attached as **Exhibit A**. Pursuant to the Agreement, Noretto agreed as follows:

> (1)    ...I will never disclose, use, copy, or retain any confidential business information or trade secrets belonging to Kelly, Kelly's customers, or Kelly's suppliers. This includes customer and employee lists; sales, service, recruiting and training techniques and manuals; sales and marketing strategies; computer programs; financial data and other similar information.

> (2)    While I am working for Kelly, **I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, stockholder, investor, agent, or consultant. These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the past five years of my employment with Kelly. [Exhibit A, ¶¶ 1, 2 (emphasis added).]**

The Agreement also provides that Noretto ". . . will pay Kelly's reasonable attorney's fees and costs involved in enforcing this Agreement." (*Id.* at ¶ 6.) Additionally, the Agreement has a Michigan choice of law provision. (*Id.* at ¶ 7.)

### 3.    Noretto's Access to and Knowledge of Kelly's Trade Secrets

During the course of his employment with Kelly, Noretto had access to and utilized on a regular basis Kelly's confidential and proprietary information, including information concerning Kelly's business affairs, customer lists, operational procedures, marketing and sales strategies and practices, pricing and contractual details for customers, customer profits, recruiting plans, and recruiting sources. (Verified Complaint, ¶ 14.)

Noretto acquired intimate knowledge concerning Kelly's customers' needs, preferences, and service needs. He had extensive contact with two of Kelly's largest and most critical accounts. The customer information such as contracts, relationship details, and pricing is housed on Kelly's computer servers, which are located in Michigan. (*Id.* at ¶ 15.) A sample of the trade secrets of which Noretto has knowledge are attached as **Exhibit B**.[1]

Noretto also acquired intimate knowledge concerning Kelly's employees, employee lists, contact information and training materials. Approximately sixty Kelly employees reported to Noretto. (*Id.* at ¶ 16.) Kelly also provided Noretto with extensive training and knowledge of Kelly's business processes, strategic planning as to the corporate, divisional, and regional business plans, marketing strategies, and recruiting strategies. Noretto also traveled to Michigan to attend divisional meetings, during which he gained knowledge of and training as to Kelly's confidential business information. (*Id.* at ¶ 17.)

---

[1] **Exhibit B** contains a <u>redacted</u> sample of Kelly's trade secrets to protect this information's confidentiality. An unredacted sample will be made available for the Court to conduct an *in camera* review upon request.

The information to which Noretto was exposed is of great value not only to Kelly, but also to its competitors who do not possess, or have access to, this information. For this reason, Kelly takes reasonable steps to ensure that its information stays confidential. Such measures include the use of non-compete, non-solicit, and confidentiality agreements, password protection, and access to information on a need-to-know basis. (*Id.* at ¶ 18.)

**B.     Noretto's Resignation from Kelly and Employment with Volt**

Noretto voluntarily resigned his employment at Kelly effective May 4, 2007. (Verified Complaint, ¶ 19.) Noretto agreed to be bound by the terms and obligations set forth in his Agreement with Kelly until May 4, 2008. *See* **Exhibit A**.

During his exit interview, Kelly reminded Noretto of his non-compete and other contractual obligations. In response, Noretto claimed that he had no employment lined up and was planning on taking time off to vacation. (Verified Complaint, ¶ 21.)

Kelly, however, recently discovered that Noretto misrepresented his plans and has gone to work for a direct competitor, Volt, in the same market area. Kelly received an e-mail from Volt in which Noretto was copied as a Volt employee. *See* **Exhibit C**. Noretto also is working with and/or soliciting, on behalf of Volt, one of Kelly's customer with which he had extensive contact while employed with Kelly. *See id.* Consequently, Noretto has wrongfully used confidential information that he learned during his employment with Kelly, and continues his work with Volt, all in knowing violation of the Agreement. The confidential information and trade secrets to which Noretto had access will directly aid his employment with a direct competitor, including Volt. (Verified Complaint, ¶ 25.)

### C.    Irreparable Harm to Kelly

As a direct consequence of Noretto's actions, Kelly stands to lose its employees, clients and customers, the goodwill and referral business of its clients and customers, and revenues in an amount that cannot be readily ascertained. (Verified Complaint, ¶ 26.) Kelly is also faced with the substantial risk that Noretto will unlawfully use Kelly's client and customer information and trade secrets to Kelly's competitive disadvantage. As a result of Noretto's actions, Kelly has suffered and will continue to suffer irreparable harm. (*Id.* at ¶ 27.)

If Noretto is not immediately barred from violating his Agreement and from using Kelly's confidential and proprietary information to solicit customers of Kelly and from otherwise participating in activities that violate the non-competition and non-solicitation provisions of the Agreement, Kelly will continue to suffer irreparable harm. (*Id.* at ¶ 28.)

### ARGUMENT

### I.    THIS COURT SHOULD GRANT A PRELIMINARY INJUNCTION RESTRAINING AND ENJOINING NORETTO'S UNLAWFUL CONDUCT.

The purpose of a preliminary injunction is to protect the status quo pending final determination of the lawsuit. *University of Texas v. Camenisch*, 451 U.S. 390 (1981). A plaintiff may obtain a preliminary injunction by demonstrating to the court that the defendant is acting in a manner that will irreparably injure plaintiff or that will render a final judgment on the merits ineffectual. *In re DeLorean Motors Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). In granting a preliminary injunction a court will determine:

1.    whether the plaintiff has shown a likelihood of success on the merits;

2.    whether irreparable harm could result to plaintiff if the preliminary injunction is not issued;

3.    whether the threatened harm to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and

4.    whether the granting of the preliminary injunction will serve the public interest.

*Lowry Computer Products, Inc. v. Head*, 984 F. Supp. 1111, 1113 (E.D. Mich. 1997). The four considerations are factors to be balanced; they are not prerequisites that must be met. *DeLorean*, 755 F.2d at 1229. A preliminary injunction should issue if the moving party "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to defendant if an injunction is issued." *Little Caesar Enterprises v. R-J-L Foods*, 796 F. Supp. 1026, 1030 (E.D. Mich. 1992) (citing *Frisch's Restaurants, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1270 (6th Cir. 1985).)

As discussed below, even if Noretto had a change of heart and intended to move forward with the utmost good faith, Noretto cannot prevent, absent appropriate injunctive relief, his knowledge of Kelly's confidential information from showing up in his work. *Lowry*, 984 F. Supp. at 1116 (If defendant "is working for a direct competitor in a similar area, their knowledge is bound to have a significant impact on Lowry's business.") Once this information has been divulged, it cannot be retrieved. This is particularly true here because Noretto was entrusted with Kelly's most sensitive information. Because Kelly can successfully satisfy these four factors, this Court should grant Kelly's Motion for Temporary Restraining Order and Preliminary Injunction.

**A.    Kelly Will Prevail on the Merits.**

**1.    Noretto Has Breached His Enforceable Agreement with Kelly.**

Kelly is likely to succeed on the merits of its action against Noretto for breach of the Agreement because: (1) Noretto is currently employed by Volt, a direct competitor of Kelly, in the same market area; and (2) Noretto is working with a customer with which he had significant

contact while employed at Kelly and consequently, has misappropriated and is misusing Kelly's trade secrets.

Michigan law provides that "reasonable" covenants not to compete against employees should be enforced. *Rehmann, Robson & Co v. McMahan*, 187 Mich. App. 36, 46; 466 N.W.2d 325 (1991). M.C.L. § 445.774a provides:

> Sec. 4a. (1) An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and **expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable** as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

*Id.* (emphasis added). A non-compete agreement is, thus, enforceable as long as: (1) it is reasonably drawn as to its duration, geographical scope, and line of business; and (2) it protects the legitimate business interests of the party seeking its enforcement. *Lowry*, 984 F. Supp. at 1116.

### a.    The Agreement Protects Kelly's Legitimate Business Interests.

The fact that Noretto's Agreement protects Kelly's legitimate business interests cannot be disputed. Employers have legitimate business interests, for example, in restricting former employees from soliciting its customers, *Merrill Lynch, Inc v. Gall*, 836 F. Supp. 428, 433-34 (W.D. Mich. 1993) (applying Michigan law); and in protecting confidential and proprietary information, such as customer lists, profit margins, corporate strategies, and pricing schemes. *Lowry*, 984 F. Supp. at 1116; *Superior Consultant Co., Inc. v. Walling*, 851 F. Supp. 839, 847-48 (E.D. Mich. 1994); *Merrill Lynch, Inc. v. Ran*, 67 F. Supp. 2d 764, 775 (E.D. Mich. 1999). Because Noretto had access to and utilized on a regular basis Kelly's most confidential

information and was granted extensive customer contact, there is no dispute that Kelly has the requisite protectable interests.

>    **b.**    **The Restrictions in the Agreement are Reasonably Tailored to Protect Kelly.**

As for reasonableness, in this case, the non-competition obligations could not be narrower. Noretto is restricted from competing with Kelly, and from soliciting Kelly's customers and employees, for a period of one (1) year from the termination of his employment, in the market area in which he worked or had responsibility during the past five years of his employment with Kelly. It prohibits Noretto only from competing with Kelly in the business of staffing services, including outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, vendor on-site and full-time placement, and consulting services. This prohibition is restricted to a narrow and focused industry. The prohibition is further limited by the market area. Noretto therefore has many opportunities to work for other companies in areas outside the restricted market area and with different customers, or in a plethora of other industries, and he is not unduly restricted from gaining a livelihood by this Agreement. As a result, the proscribed activity in the restrictive covenant is reasonable.

With respect to time limitation, one year is also reasonable. Michigan courts have consistently held that covenants with one-year durations are reasonable and enforceable. *Far longer periods of time have been upheld. See, e.g., Lowry,* 984 F. Supp. at 1116 (finding one year reasonable and emphasizing that "as to duration, courts have upheld time periods of six months to *three years*."); *Bristol Window & Door, Inc. v. Hoogenstyn,* 250 Mich. App. 478; 650 N.W.2d 670 (2002) (enforcing a three-year, statewide non-competition agreement executed by an independent sales representative). Therefore, the duration of one year in Noretto's

Agreement is more than reasonable and necessary to protect Kelly's customer goodwill, competitive edge, and confidential and trade secret information.

The geographic limitation in Noretto's Agreement – "any market area in which I worked or had responsibility" – is sufficiently and reasonably tailored to protect Kelly's customer goodwill, competitive edge, and trade secrets. Relative to geographic limitations, it has been specifically held that reasonable geographic limitations may be unlimited and as broad as the entire continental United States if the plaintiff's business is sufficiently national and international in scope. *Walling*, 851 F. Supp. at 847 (emphasizing that Superior "does business in forty-three states"). Michigan courts also do not require specific language in the non-compete agreement as to the geographic scope. For instance, courts will allow a reasonable customer restriction to substitute for a geographic restriction. *See, e.g., Frontier Corp v. Telco Comm. Group., Inc.,* 965 F. Supp. 1200 (S.D. Ind. 1997) (applying Michigan law and holding that the non-compete covenant, which contained no geographic term, was enforceable as to customers that the defendant successfully solicited.)

In this case, although Kelly's business is national and international in scope, the prohibition is limited only to the market area where Noretto worked or had responsibility. The market area where he worked included Multnomah, Clackamas, Washington, Columbia, Clatsop, Marion, Yamhill, Linn, Tillamook, Lincoln and Wasco Counties, in the State of Oregon and Clark, Skamania, and Cowlitz Counties, in the State of Washington. The non-competition clause does not have to expressly list these counties; it is sufficient that the clause prohibits Noretto

from working in any market area where he worked or had responsibilities. Thus, the language of the non-competition agreement and the resulting prohibition is reasonable and enforceable.[2]

In view of the above stated case law, it is clear that the non-compete and non-solicit obligations in the Agreement between Noretto and Kelly are legally enforceable under Michigan law. The restrictions are reasonable as to time, geography, and type of work proscribed.

### c.    Noretto Has Blatantly Violated His Reasonable Agreement.

There is no dispute that Noretto violated his Agreement with Kelly. Noretto agreed that for one year after leaving Kelly's employment, he would not to compete against Kelly or associate himself with any Kelly competitor, in any market area in which he worked or had responsibility during the last five years of his employment with Kelly.   Kelly has recently discovered that Noretto is working for Volt, in the same market area that he was responsible for as a Kelly employee. His new employment is a clear breach of the non-competition provision in his Agreement with Kelly.

Furthermore, Noretto agreed that he would never use or disclose any confidential business information or trade secrets belonging to Kelly or Kelly's customers.  Despite these contractual obligations, Noretto is using Kelly's confidential information and trade secret to compete, solicit key customers of Kelly, and undermine Kelly's customer goodwill and competitive edge. As a result of his actions, Noretto has breached, and is continuing to breach, his Agreement with Kelly.

---

[2] The Court may enforce the agreement to the extent the contract is unreasonable by substituting reasonable terms for those omitted or found to be unreasonable.  Under Michigan law, courts are permitted to modify overbroad covenants to the extent needed to protect the employer's legitimate interests.  MCL § 445.774a(1); *Rehman,* 187 Mich. App. at 46.

2. **Noretto Has Violated the Michigan Uniform Trade Secret Act.**

Noretto's use and disclosure of Kelly's confidential information is also enjoinable under the Michigan Uniform Trade Secrets Act (MUTSA), M.C.L. § 445.1901, et seq.   M.C.L. § 445.1903(1) provides:

> Actual or threatened misappropriation may be enjoined.  Upon application to the court of competent jurisdiction, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

Under MUTSA, a two prong analysis is employed to determine whether information constitutes a protectable trade secret:

1.   Does the information derive independent economic value from not being generally known to others; and

2.   Did the employer take reasonable steps to protect the confidentiality of the information. [M.C.L. § 445.1901; *Ran,* 67 F. Supp. 2d at 775.]

Any argument by Noretto that the information that was misappropriated is public knowledge is simply incorrect.  Information concerning Kelly's pricing, services, and customers constitutes intimate knowledge, attainable only because of Noretto's employment with Kelly.  *See Morlife v. Perry*, 56 Cal. App. 4th 1514, 1521; 66 Cal. Rptr. 2d 731 (1997) ("[W]here the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market.").

Courts will order injunctive relief even when no actual misappropriation has occurred, but misappropriation is threatened.  This general rule is consistent with numerous decisions from other courts enjoining threatened disclosure pursuant to the Uniform Trade Secrets Act.  *See, e.g., Pepsico, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir. 1995) (applying Illinois law); *La Calhene,*

11

*Inc v. Spolyar*, 938 F. Supp. 523 (W.D. Wis. 1996) (applying Wisconsin law and enjoining defendant from using plaintiff's confidential information, such as strategic and marketing plans and technical specifications); *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405 (N.D. Iowa 1996) (applying Iowa law and finding irreparable harm in light of the economic value derived from plaintiff's confidential information and defendant's employment with a competitor).

In *PepsiCo, Inc. v. Redmond*, the Court was faced with a similar factual scenario and applied Illinois' version of the MUTSA. Redmond worked for PepsiCo as a general manager, which gave him access to inside information and trade secrets, such as strategic plans, marketing, distribution information, marketing plans, growth expectations, operational changes, and financial goals. As part of his employment, Redmond signed a confidentiality agreement with PepsiCo. Redmond *did not* sign a non-compete agreement. Redmond subsequently resigned his employment with PepsiCo and accepted employment with Gatorade. At the outset, the Seventh Circuit pointed out that the Illinois Trade Secret Act provided that a court may enjoin the "actual or threatened misappropriation" of a trade secret. The Court pointed out that "PepsiCo finds itself in the position of a coach, one of whose players have left, playbook in hand, to join the opposing team before the big game." *Id.* at 1270.

Thus, when the Court of Appeals coupled the demonstrated inevitability that Redmond would rely on PepsiCo's trade secrets, with the district court's reluctance to believe that Redmond would refrain from disclosing these secrets in his new position, the Court of Appeals concluded that the district court correctly decided that PepsiCo demonstrated a likelihood of success in its statutory claim of trade secret misappropriation. *Id.* at 1271. Despite the fact that Redmond had only a confidentiality agreement, the Court of Appeals affirmed the district court's holding enjoining Redmond from assuming his responsibilities for Gatorade. *Id.* at 1272.

As in *PepsiCo*, this Court also has wide latitude in fashioning injunctive relief, and must fashion the relief appropriate to preserve the parties' rights. Noretto was among a select few placed in a position of trust and confidence with regard to Kelly's confidential business information and key customers. During his employment, Noretto worked with the most proprietary, sensitive and confidential business information of Kelly including, but not limited to, confidential compensation methods, customer needs, customer account information, prospective customer information, strategic plans, and marketing strategies. Kelly's confidential and proprietary information and documents have been established at considerable time and expense to Kelly and are not generally known. Kelly's proprietary and confidential information and trade secrets are of immense value to anyone operating in a similar business as Kelly, such as Volt. Kelly created the information and property that Noretto has in his possession over many years and at a great cost.

Noretto's use and disclosure of Kelly's proprietary and confidential information for Volt's advantage is inevitable. Noretto has fiduciary obligations not to disclose this information and not to wrongfully use this information for his own competitive advantage. Noretto's possession and inevitable use of Kelly's trade secrets has allowed Noretto and Volt to step into the shoes of Kelly, without having to spend money and do the work performed by Kelly to develop the information and property. Accordingly, Noretto's use of Kelly's confidential information is also enjoinable under MUTSA, and all claims contained in the Verified Complaint will result in success on the merits.

**B.      If Preliminary Injunctive Relief Is Not Granted, Kelly Will Suffer Irreparable Injury.**

Kelly will suffer irreparable harm if a preliminary injunction is not granted. In discussing irreparable harm, the Michigan Supreme Court has noted that:

> An injury to be irreparable need not be such as to render its repair physically
> impossible; but it is irreparable when it cannot be adequately compensated in
> damages, or when there exists no certain pecuniary standard for the measurement
> of damages due to the nature of the right or property injured.

*Ainsworth v. Hunting & Fishing Club*, 153 Mich. 185; 116 N.W. 99 (1908) (citations omitted).

Similarly, Judge Cohn, in *Superior v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994), stated

that "[l]oss of customer goodwill and fair competition can support a finding of irreparable harm.

Such losses are difficult to calculate." *Id.* at 847. Furthermore, the court in *Lowry* held that the

disclosure of confidential, proprietary information by a former employee in new employment can

(and did there) constitute irreparable harm to the former employer. 984 F. Supp. at 1116.

Unless enjoined by this Court, Noretto will continue to use Kelly's confidential

information and trade secrets in violation of his contractual and fiduciary duties to Kelly. As

described above, Noretto acquired detailed confidential and proprietary information and trade

secrets of Kelly. His disclosure of this information and violation of his Agreement will inflict

irreparable harm on Kelly.

As recognized by the courts, it would be totally unreasonable to expect Noretto to work

in a similar position for a direct competitor and ignore his intimate knowledge of Kelly's

confidential business information. *See Lowry*, 984 F. Supp. at 1116 (Defendant's "knowledge is

bound to have significant adverse impact on Lowry's business.") *See also Walling*, 839 F. Supp.

at 847-48 (finding that "use of this knowledge [client confidential information] would enable

[Defendant] effectively to undercut [Superior's] rates while providing the same services

provided by [Superior].")

Therefore, because of Noretto's breach of his Agreement and misappropriation of Kelly's

trade secrets, Kelly is suffering irreparable harm to its customer goodwill and competitive

position. Kelly has no adequate remedy at law for Noretto's misconduct because the injuries that

14

Kelly has suffered and will continue to suffer in connection with the loss of its customer goodwill are so indefinite and speculative as to be incapable of exact proof. *See Chem-Trend v. McCarthy,* 780 F. Supp. 463 (E.D. Mich. 1991) (finding that "it would not be possible to measure plaintiff's actual loss of customers and goodwill"); *Walling,* 851 F. Supp. at 847 (*citing Basicomputer Corp v Scott,* 973 F2d 507 (6th Cir 1992)) (stating that damages are often irreparable because they are difficult to calculate).

**C.    The Harm to Kelly If a Preliminary Injunction Is Denied Outweighs the Harm to Noretto If It Is Granted.**

The injunction requested by Kelly only prohibits Noretto from working for Volt in any market area that they worked or had responsibility for while employed by Kelly, from using Kelly's confidential information and trade secrets, and from avoiding his contractual, statutory, and fiduciary obligations. It merely prevents Noretto from committing wrongful acts that interfere with Kelly's contractual and property rights. Noretto is free to seek employment that does not violate his obligations or involve the use or disclosure of Kelly's trade secrets and confidential information. Therefore, there can be no harm to Noretto.

On the other hand, Kelly faces irreparable harm if an injunction is not granted. The loss to Kelly of customer goodwill or any confidential information is incalculable. The harm to Kelly should this Court deny a preliminary injunction far outweighs the harm to Noretto should it be granted. *See Walling, supra.*

**D.    The Public Interest Supports the Issuance of a Preliminary Injunction.**

The public interest in protecting confidential information and enforcing valid employment contracts justifies preliminary injunctive relief. If the courts do not enjoin parties to such agreements from violating them and from misappropriating trade secrets, then the statute becomes a dead letter.

The public also has an interest in proper adjudication of disputes. The object of a preliminary injunction is "to preserve the status quo (*i.e.*, the uncontested status which precedes the pending controversy)." *Detroit v. Salaried Phys, UAW*, 165 Mich. App. 142, 151; 418 N.W.2d 679 (1987). In this case, the status quo to be preserved is the status that preceded Noretto's misappropriation of Kelly's confidential business information and breach of contract. A preliminary injunction would simply insure that no further injury will result to Kelly pending a final hearing on the merits. Thus, the public interest supports not only the enforcement of reasonable agreements, but also the enjoining of violations of such agreement prior to a trial.

## CONCLUSION

Based on the foregoing, Kelly requests that this Court grant the relief requested in the Verified Complaint, and enter a Temporary Restraining Order and Order to Show Cause, and then a Preliminary Injunction.

Respectfully submitted,

BUTZEL LONG

By: _____
        James J. Giszczak (P46917)
        Katherine D. Goudie (P62806)
        150 West Jefferson, Suite 100
        Detroit, Michigan 48226
        (313) 983-7475
        E-mail: giszczak@butzel.com
                  goudie@butzel.com
Dated: June 4, 2007              Attorneys for Plaintiff

924901.1

16





# AGREEMENT WITH
# FULL-TIME EMPLOYEES
# OF KELLY® CORPORATIONS

# Statement of Purpose

In order to provide the highest quality service to its customers and maintain its leadership position in the temporary help industry, Kelly Services spends substantial time, effort and money in recruiting and training its employees, and developing programs and services to meet its customers' needs. All Kelly employees have an obligation to help protect this investment.

\*    •    \*    •

In consideration of my employment with Kelly Services, Inc., Kelly Assisted Living Services, Inc., or any other Kelly corporation ("Kelly"), I agree as follows:

(1)  Unless required by my job at Kelly, I will never disclose, use, copy or retain any confidential business information or trade secrets belonging to Kelly, Kelly's customers or Kelly's suppliers. This includes customer and employee lists; sales, service, recruiting and training techniques and manuals; sales and marketing strategies; computer programs; financial data and other similar information.

(2)  While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, stockholder\*, investor\*, agent or consultant. These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the last five years of my employment with Kelly.

(3)  Kelly may use and publish my name and picture, including audio or video tape recordings, for purposes relating to its business without a specific release from me.

(4)  Any new idea, invention, improvement, or copyrightable work I create, develop or help develop belongs to Kelly if it relates to Kelly's business. If any such development or creation occurs during my employment or up to one year after I leave Kelly, I will promptly disclose and explain it and assign to Kelly all rights I may have in it without additional compensation.

(5)  Either of us may end the employment relationship at any time with or without cause, subject to applicable laws concerning non-discrimination with regard to age, race, sex and the like. However, Kelly shall give me a minimum of two weeks' notice (or two weeks' wages in lieu of notice) unless there is reason for immediate termination, such as dishonesty, serious misconduct or a significant violation of corporate policy.

---

\*Except up to 2% of the stock of a publicly traded company.

(6)   If I break this Agreement, Kelly is entitled to recover as damages from me the greater of the amount of the financial loss which Kelly suffers as a result or the amount of the financial gain which I receive. I will pay Kelly's reasonable attorney's fees and costs involved in enforcing this Agreement.

(7)   This Agreement will be interpreted and enforced under Michigan law. If a court finds any part of this Agreement invalid, the rest of it will be enforced to the extent permitted.

(8)   I will make any claim and bring any action or lawsuit I may have relating to my employment with Kelly within one year after leaving my employment. I agree to waive any statute of limitation to the contrary.

(9)   This Agreement takes the place of all previous employment agreements. Any changes must be in writing, and must be signed by me and by two senior corporate officers of Kelly.

(10)  My signature below indicates that I have read, understood and agreed to the provisions of this Agreement.

KELLY SERVICES, INC.
KELLY ASSISTED LIVING SERVICES, INC.

_Ned Noretto_
Employee Signature

_T. C. Adderley_
T. E. Adderley
President and Chief Executive Officer

_Ned Norxtto_
Employee Name (typed/printed)

Social Security Number

_Portland_          _5010_
Branch/Dept. Name      Branch/Dept. Number

Date: _2/1/02_

**INSTRUCTIONS**
_Ask the employee to sign three forms:_
* _Send one to Compensation, Benefits and Employee Information._
* _Give one to the employee for his/her records._
* _Retain one in the branch._





DSS200RR

Pending Details Sales Activity Report

Week Ending:    27-MAY-07

Division: MAJOR MARKET
Region: MAJOR-WEST
Area: PORTLAND
City: PORTLAND, OR DISTRICT
Customer Name          Service Line          Pend.Exp.$Vol          GP %          Closure %          Entry Date          Update Date

Division: MAJOR MARKET

REDACTED

KELLY RESTRICTED - Only Originator May Authorize Copy
30-May-2007 12:54:20

Page 1 of 15

Kelly Services, Inc.
Last Modified Date: 23-Apr-2003



DSS2200RR

Pending Details Sales Activity Report

Week Ending: 27-MAY-07

Division: MAJOR MARKET
Region: MAJOR-WEST
Area: PORTLAND/
City: PORTLAND, OR DISTRICT

Customer Name    Service Line    Pend.Exp.$Vol    GP %    Closure %    Entry Date    Update Date

REDACTED

Kelly Services, Inc.
Last Modified Date: 23-Apr-2003



SEH America Solutions

KELLY
SERVICES

eSolutions





# KELLY
## SERVICES

# eTools

# Kelly eSolutions

**REDACTED**



**SEH America Q&A**



KELLY
SERVICES

REDACTED



# KELLY SERVICES

# Quarterly Business Review



REDACTED

# 2006 Key Results and Measures





## 2006 Time to Fill

REDACTED

**KELLY SERVICES**



## 2006 Turnover Percentage

REDACTED

# 2006 Cost Data by Month



REDACTED

10

**KELLY** SERVICES

REDACTED

# SEH ONSITE SUPPORT

## Kelly Services On-Site
## (MODIFIED)

REDACTED





**SEH America**
Pricing Analysis

**REDACTED**

**SEH America**
Pricing Analysis

OPST: 24D                    OPERATING STATEMENT              MAJOR MARKET
                             KTS US OPERATIONS                MAJOR-WEST
                             COMBINED SERVICE LINES           AREA: A122 PORTLAND/

———— C U R R E N T   M O N T H ————        ———— Y E A R   T O   D A T E ————

**REDACTED**

OPST:  Z4O

OPERATING STATEMENT
KTS US OPERATIONS
COMBINED SERVICE LINES
APRIL 2007

MAJOR MARKET
MAJOR-WEST
AREA: A322 PORTLAND
CITY:

——— C U R R E N T   M O N T H ———

——— Y E A R   T O   D A T E ———

**REDACTED**

REDACTED

PAGE  108

BDCB8310

FOR THE PERIOD YTD THRU: APRIL

MAJOR MARKET

R0112 MAJOR-WEST

E0310 PORTLAND, OR DISTRICT

A122 PORTLAND

TOP 25 SALES REPORT
INDIVIDUAL ACCOUNTS

| CUSTOMER NAME | PARENT COMPANY NAME | YTD 2006 RANK | YTD 2006 PCT OF TOTAL SALES | YTD 2007 RANK | YTD 2007 SALES | YTD PCT OF TOTAL SALES | PERCENT INC (+) DEC (-) |
|---|---|---|---|---|---|---|---|

PRINTED: 05/12/07

KELLY SERVICES, INC.

CONFIDENTIAL



&



SERVICES

### _Response to Request for Information_

_Respectfully Submitted by,_

_Melissa M. Perez_

**_Wednesday, December 20, 2006_**

**REDACTED**

## *Pricing*

*The following markup rates are being offered to SEH America Corporations*

| Service Line | Regular Markup | Direct Hire | Payroll Service with Benefits | Payroll Service without Benefits |
|---|---|---|---|---|
| Manufacturing | �switch | █████ | █████ | █████ |
| Engineering/Production | █████ | | █████ | █████ |
| Information Technology/Accounting and Finance (Professional/ Technical Services) | ███ | █████ | █████ | █████ |

**REDACTED**

### *Payroll Service*



### *Kelly Select/Direct Placement*



### *Confidentiality*



### *Benefits*



### *Incentive Programs*



**REDACTED**



REDACTED



"Davis, Lara S."
<LDavis@Volt.com>
05/22/2007 04:37 PM

To   <PEREZME@kellyservices.com>

cc   "Craig, Carrie" <CCraig@Volt.com>, "Oswold, Kari" <KOswold@volt.com>, "Noretto, Ned" <NNoretto@volt.com>, "Larson, Lori" <LLarson@Volt.com>

Subject   Effective date of administrative fee in Kelly/SEH-Volt agreement

Melissa -

Thank you for explaining your position on the effective date for Kelly's ⬤% administrative fee. Based on your concerns, we have discussed the matter in detail in a conference call. We do appreciate the fact that both Kelly and Volt have been able to proceed with services during the pendency of the contract negotiations, and we do not want either party to regret the decision to do so in retrospect.

We understand that Kelly's concern about the effective date of this provision stems from the fact that Kelly has proceeded upon verbal agreement to provide Volt with ⬤% of the SEH orders and that, to date, Kelly has not received any of the accumulated fees contemplated in the agreement; also, it has been suggested that Volt "caused" a delay by requesting changes to the originally proposed contract terms, so perhaps Kelly had not anticipated any negotiation process. Conversely, Volt's concern about the effective date is based on the fact that, during the period for which Volt would be charged this administrative fee, Volt's program manager has played a critical role in the transition to Kelly, has provided training to the Kelly on-site, and has continued to manage significant administrative issues; also, Volt participated in the negotiation process in good faith and felt that process was prolonged by Kelly's desire to make all document revisions itself and its omission of certain agreed-upon terms from the resulting drafts.

In order to resolve this issue and address both parties' concerns, we propose a compromise on the