UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY SERVICES, INC.,

                                        Plaintiff,

                                                    CIVIL CASE NO. 07-12389

v.

NED NORETTO,                                        HONORABLE PAUL V. GADOLA
                                                    U.S. DISTRICT COURT
                                        Defendant.
_____/


## **ORDER**

Now before the Court are Plaintiff Kelly Services, Inc.'s ("Kelly") motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a); Defendant Ned Noretto's ("Noretto") motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2); and Defendant Noretto's motion to dismiss or transfer for improper venue, pursuant to 28 U.S.C. §§ 1391, 1406.[1]

For the reasons stated below, the Court will grant Plaintiff's request for a preliminary injunction and deny Defendant's motions to dismiss or transfer venue.

I.       **Factual Background**

Plaintiff Kelly Services, Inc., is a Delaware corporation with its principal place of business in Troy, Michigan. Defendant Ned Noretto is a citizen and resident of Oregon. Noretto has been

---

[1]The Court notes that Defendant has not made an argument that, pursuant to 28 U.S.C. § 1404, venue should be transferred to the District of Oregon for the convenience of the parties and the witnesses.

engaged in the "staffing industry" for twenty-one years and was employed by Kelly from January 28, 2002 through May 4, 2007.   Noretto was employed by Kelly as a Regional Manager for the Major Markets Division, working out of the Portland, Oregon branch office.  Noretto's geographic area of responsibility included Multnomah, Clackamas, Washington, Columbia, Clatsop, Marion, Yamhill, Linn, Tillamoook, Lincoln and Wasco counties in the State of Oregon, as well as Clark, Skamania, and Cowlitz counties, in the State of Washington.

At the time Defendant Noretto began employment with Kelly in 2002, Noretto executed a document entitled "Agreement with Full Time Employees of Kelly Corporations" ("Agreement"). The Agreement provides, in pertinent part:

> In consideration of my employment with Kelly Services, Inc., Kelly Assisted Living Services, Inc., or any other Kelly corporation ("Kelly"), I agree as follows:
>
> (1)    Unless required by my job at Kelly, I will never disclose, use, copy or retain any confidential business information or trade secrets belonging to Kelly, Kelly's customers or Kelly's suppliers.  This includes customer and employee lists; sales, service, recruiting and training techniques and manuals; sales and marketing strategies; computer programs; financial data and other similar information.
>
> (2)    While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, stockholder, investor, agent or consultant.  These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the last five years of my employment with Kelly.

Pl.'s Verified Compl., p. 15

On April 2, 2007, after five years of employment with Kelly, Defendant submitted a verbal resignation to his supervisor, located in Troy, Michigan.  Although Defendant maintains that he resigned only because he was about to be fired- a contention Defendant denies- Noretto does not dispute that his resignation was voluntary.  The resignation was to be effective May 4, 2007.

The parties dispute the exact manner in which Defendant departed his employment with Kelly. Plaintiff alleges that when Noretto's supervisor questioned Noretto about his future plans for employment following resignation, Noretto indicated that he had no other plans for employment at that time, that he simply couldn't do that type of work anymore, and that he was taking an extended vacation with his family. Plaintiff further alleges that Defendant was reminded of the pertinent non-compete, non-solicit, and non-disclosure clauses in the Agreement. Defendant disputes that he ever participated in an exit interview upon his resignation from Kelly or that the clauses were specifically brought to his attention.

Shortly after Defendant resigned his employment from Kelly on May 4, 2007, Defendant allegedly began working for Volt Information Service, Inc. ("Volt"), a direct competitor of Kelly in the staffing industry. Kelly became aware of Defendant's employment with Volt when an email was exchanged between employees of the local offices of Volt and Kelly. In the email between the companies regarding a mutual client that Noretto had allegedly serviced while with Kelly, Noretto was included as a recipient in his capacity as a Volt employee. Therefore, Plaintiff became aware that Noretto had taken up employment with its direct competitor Volt, and that Noretto was possibly soliciting his former clients.

Kelly alleges that, as part of his employment and specific position with Kelly, Noretto had access to, and utilized on a regular basis, Kelly's confidential and proprietary information including information concerning Kelly's business affairs, customer lists, operational procedures, marketing and sales strategies and practices, contractual details for customers, regional customer pricing and profit margins, recruiting plans, and recruiting sources. Additionally, Kelly claims that Noretto acquired intimate knowledge concerning Kelly's customers' preferences and service needs, and had

extensive contact with two of Kelly's largest and most critical accounts. Plaintiff also alleges that just two weeks before Defendant's separation, Defendant received a "flash drive" containing work proposals for Kelly's customers and prospective customers and other confidential information and trade secrets of Kelly. Plaintiff contends that, despite requests to do so, Defendant has failed to return the flash drive containing the information. Plaintiff asserts that the information to which Noretto was exposed in his position with Kelly is of great value, not only to Kelly, but also to its competitors who do not possess, or have access to, this information.

Kelly now claims that as a result of the aforementioned factual developments, Noretto is in violation of the terms of the Agreement he signed upon employment with Kelly and that he is in violation of the Michigan Uniform Trade Secrets Act ("MUTSA"), M.C.L. § 445.1901, *et seq*. Kelly alleges that it faces a substantial risk that Noretto will unlawfully use Kelly's client and customer information and trade secrets to Kelly's competitive disadvantage. Kelly argues that it stands to lose employees, clients, and customers; lose confidential, proprietary and trade secret information; lose goodwill and referral business of its clients and customers; and suffer a decrease in revenues in an amount that cannot readily be ascertained.

## II.    Procedural Background

On June 6, 2007, following Plaintiff's motion for a temporary restraining order, the Court conducted an ex-parte hearing and issued the order. *Order Granting Temporary Restraining Order* [docket entry #5]. The Court also scheduled a hearing for June 14, 2007 on Plaintiff's motion for a preliminary injunction. At the June 14, 2007 preliminary injunction hearing, each side made brief remarks and then stipulated to an extension of the TRO until July 9, 2007. The Court ordered further briefing of the parties' positions and set a hearing for the pending matters on July 9, 2007.

Plaintiff now seeks a preliminary injunction, restraining and enjoining Defendant Noretto, directly or indirectly:

(a) from working for, or acting as, and employee, partner, stockholder, investor, owner, director, agent, or consultant for a competitor of Kelly (including, but not limited to, Volt) within Multnomah, Clackamas, Washington, Columbia, Clatsop, Marion, Yamhill, Linn, Tillamook, Lincoln and Wasco Counties, in the State of Oregon and Clark, Skamania, and Cowlitz Counties it the State of Washington, until May 4, 2008

(b) from soliciting or performing services for any Kelly customer for a competing business until May 4, 2008

(c) from soliciting or being involved in the recruitment or hire of any Kelly employee for a competing business (including but not limited to Volt) until May 4, 2008

(d) from ever using or disclosing any of Kelly's confidential, proprietary or trade secret information or property;

(e) from interfering, in any way, with any current or prospective customer or employee relationship of Kelly; and

(f) from breaching any fiduciary obligation and duties of loyalty to Kelly, including but not limited to, appropriating any business opportunity of Kelly, engaging in deceptive acts or statement with regard to Kelly's ability, experience and personnel, otherwise attempting to gain unfair advantage in the employee leasing and staffing business, or disclosing or using Kelly's confidential or proprietary

information.

Pl.'s Verified Compl., p. 10.

Kelly also requests that the Court require Noretto to return all Kelly property to Kelly, including all originals and copies of tangible property, proprietary documents, trade secrets, confidential information, discs, notes, client files, client information, employment information, business development information, request for proposal, request for bid, client correspondence, meeting minutes, notes of site visits, marketing data, prospect meeting data, proposals, faxes, financial information, pricing contracts, marketing brochures, marketing database, marketing plans, costs, customer lists, customer information, internal weaknesses, prospect lists, client lists, employee lists, alliance relationships, competitive bid information, client contact lists, sales leads, prospective employee lists, business plans, profit margin, and forecasting information, strategic planning, project costs, and any other Kelly data kept in any form or media whatsoever. *Id.*

Defendant has now filed two motions of his own. First, Defendant asserts that because he lives and works in Oregon, because his only actions in Michigan consisted of attending mandatory training for Kelly in Michigan, and because his actions have had no consequences in Michigan, the Court lacks personal jurisdiction over him. Second, Defendant maintains that because there is no property at issue in this matter and because the events and conduct at issue all occurred in and around Portland, Oregon, venue is proper in Oregon. Therefore, Defendant asks this Court to direct that this case be dismissed or transferred to the District of Oregon.

The Court will first address the issue of personal jurisdiction.

## III. Personal Jurisdiction

Defendant Noretto moves to dismiss the case for lack of personal jurisdiction, pursuant to

Federal Rules of Civil Procedure 12(b)(2).  Defendant maintains that personal jurisdiction is inappropriate in Michigan.  Defendant argues that he is a resident of Oregon and has only come to Michigan on several sporadic occasions when required to do so as part of his employment with Kelly.  Furthermore, Noretto argues that there was no act done or consequences that occurred in the State of Michigan as part of the basis for this action.

### A.  Legal Standard

Plaintiff bears the burden of establishing personal jurisdiction.  *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002); *MCNIC Oil & Gas Co. v. IBEX Resources Co.*, 23 F. Supp. 2d 729, 732 (E.D. Mich. 1998) (Gadola, J.).  The standard for evaluating whether personal jurisdiction exists depends upon whether the Court conducts an evidentiary hearing on the issue.  In this case, because the Court has not conduced an evidentiary hearing on this issue, Plaintiff "need only make a prima facie showing of jurisdiction."  *Bird*, 289 F.3d at 871 (citation and internal quotation omitted).  Under this standard, the United States Court of Appeals for the Sixth Circuit has stated that the pleadings and affidavits should be considered in the light most favorable to Plaintiff and has characterized Plaintiff's burden of establishing jurisdiction as "relatively slight."  *Welsh v. Gibbs*, 631 F.2d 436, 438-39 (6th Cir. 1980).

In diversity cases such as the instant one, courts look to the law of the forum state to determine whether personal jurisdiction exists.  *Nationwide Mutual Ins. Co. v. Tryg Int'l. Ins. Co.*, *Ltd.*, 91 F.3d 790, 793 (6th Cir. 1996).  The nature of Defendant's contacts with the forum determine whether personal jurisdiction is characterized as general or specific.  *Conti v. Pneumatic Prods. Corp.*, 977 F.2d 978, 981 (6th Cir. 1992).  General jurisdiction exists when a defendant exercises continuous and systematic contacts with the forum state, while specific jurisdiction exists when a

plaintiff's claims arise out of or relate to a defendant's conduct with the forum state. *See id.; Kerry Steel, Inc. v. Paragon Indus.*, 106 F.3d 147, 149 (6th Cir. 1998).

To establish personal jurisdiction, Plaintiff "must show that (1) the Michigan long-arm statute supports the Court's exercise of personal jurisdiction and (2) the exercise of jurisdiction would not violate the Due Process Clause of the Fourteenth Amendment." *Viches v. MLT, Inc.*, 127 F. Supp. 2d 828, 830 (E.D. Mich. 2000) (Gadola, J.). *See also Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 888 (6th Cir. 2002).

Using the "relatively slight" threshold standard, *see Welsh*, 631 F.2d at 438-39, the Court must initially examine the first of the two requirements for establishing personal jurisdiction: whether the Michigan long-arm statute supports the Court's exercise of personal jurisdiction. *See Viches*, 127 F. Supp. 2d at 830.

Under the law of the forum where the Court is located, the Michigan long-arm statute permits limited personal jurisdiction over an individual or corporation, enabling the court to render personal judgments against the individual or corporation, when the cause of action arises out of the "transaction of any business within the state." M.C.L. § 600.705. This Court has previously noted that the standard of the Michigan long-arm statute is "extraordinarily easy to meet." *Viches*, 127 F. Supp. 2d at 830 (Gadola, J.). Indeed, the phrase, "any business within the state" has been very broadly interpreted. The Sixth Circuit has held that where a defendant does even the "slightest act of business in Michigan," the first statutory criterion for personal jurisdiction under the Michigan long-arm statute is satisfied. *Lanier v. Am. Bd. of Endodontics*, 843 F.2d 901, 906 (6th Cir. 1988).

The next step is to consider whether Defendant has "minimum contacts" with the forum state such that "the maintenance of the suit does not offend traditional notions of fair play and substantial

justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945). The Sixth Circuit has established a three-part test for this analysis. *See Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998); *Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). First, the defendant must purposefully avail himself of the privilege of conducting activities within the forum state. *Cole*, 133 F.3d at 436. Second, the cause of action must arise from the defendant's activities there. *Id.* Third, the acts of the defendant or consequences caused by the defendant's actions must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant fundamentally fair. *Id.*

### B. Analysis

In the present case, Defendant has transacted business within the State of Michigan, providing sufficient grounds for the Court to exercise personal jurisdiction over him under M.C.L. § 600.705(1). Defendant was recruited and hired out of Plaintiff's Michigan offices. When he was hired by Kelly, he signed the Agreement containing the non-compete, non-solicit, and non-disclosure clauses, accepting those terms as the terms of his employment with the Michigan headquartered Kelly Services, Inc. Clearly, each of those clauses are meant to protect the interests and information of Michigan based Kelly. Furthermore, during his five year career at Kelly, Defendant attended training sessions in Michigan; Defendant called, faxed, or emailed on weekly or daily basis his Michigan based supervisors; and Defendant routinely accessed information on Kelly's Michigan based computer servers in his efforts to transact business in his position with Kelly. It is information that was obtained in the training sessions, through Kelly's Michigan based servers, and through Defendant's actions with the Michigan company that Kelly now seeks to protect in this action. Additionally, there can be little doubt that Noretto's alleged breach of the

Agreement and alleged misappropriation of trade secrets have a direct effect on Michigan based Kelly Services, Inc. Such contacts are patently sufficient to surmount the "transaction of any business within the state" threshold for personal jurisdiction under the Michigan long arm statute. M.C.L. § 600.705. *See also ACS Consultant Co., Inc. v. Williams*, Case No. 06-11301, 2007 WL 674608 at *7 (E.D. Mich. Mar. 5, 2007).

Additionally, in his employment with Kelly, Noretto served in a "high level position as Kelly's Regional Manager for the Major Markets Division." Pl.'s Resp. Br., Ex. A, Aff. of Sheen Watkins ¶ 5 [docket entry 17-3, p. 2]. Holding such a managerial position with Kelly, a business with its principal place of business in Michigan, subjects Defendant to the reach of the Michigan long arm statute under MCL § 600.705(6).

Accordingly, because the Court finds that limited personal jurisdiction under the Michigan long arm statute is present, an analysis of whether the Court has general personal jurisdiction is unnecessary. Furthermore, the Court need not consider Plaintiff's argument as to whether Defendant waived any objection to personal jurisdiction. *See* Fed. R. Civ. P. 12(h).

Turning next to consider whether Defendant has "minimum contacts" such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice," *Int'l Shoe Co. v. Washington*, 326 U.S. 310, the Court finds that Defendant does have sufficient minimum contacts. Defendant purposefully availed himself of the privileges of conducting activities within the forum state when he became employed by a company headquartered in Michigan; entered into a non-compete, non-solicit, and non-disclosure agreement with Kelly; entered into the Agreement containing a Michigan choice of law provision; continuously reported to supervisors working in Michigan; made several trips to Michigan for training purposes, and frequently used information

stored on the company's Michigan based servers. *Cole*, 133 F.3d at 436. *See also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 482 (1985) (finding: (1) that a Florida District Court had personal jurisdiction over a Michigan franchisee whose only contacts with Florida were a franchise agreement with the Florida corporation and communications to Florida via telephone calls and letters and (2) that a choice of law provision should not "be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's law'" for jurisdictional purposes); *Superior Consulting, Inc. v. Walling*, 851 F. Supp. 839, 844 (E.D. Mich. 1994) (finding that an employee that negotiated an employment contract with a Michigan company, made numerous trips to Michigan while employed, and was in frequent contact with the employer's Michigan office via telephone, voice mail, fax, mail, and e-mail, had sufficient minimum contacts).

Therefore, after a thorough consideration of the matter, the Court finds that the Sixth Circuit's three-part test for determining whether the Court may exercise limited jurisdiction over Defendant in accordance with Due Process is satisfied. *Cole*, 133 F.3d at 436. Plaintiff has presented a prima facie case that Defendant has transacted business in the State of Michigan for the purpose of the Michigan long arm statute and that those acts have given rise to the present action. Additionally, because Defendant "purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Viches*, 127 F. Supp. 2d at 830-31 (quoting *Int'l Shoe Co.*, 326 U.S. at 316), he created minimum contacts with Michigan such that the "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316.

Accordingly, the Court will deny Defendant's motion to dismiss the case for lack of personal jurisdiction.

## IV.   Change of Venue

Defendant next moves this Court to dismiss this action for improper venue or, in the alternative, to transfer venue to the District of Oregon.  *See* 28 U.S.C. §§ 1391, 1406; Fed. R. Civ. P. 12(b)(3).  Defendant argues that venue in the Eastern District of Michigan is improper because Defendant resides in Oregon and there are no events that occurred in Michigan or property located in Michigan that are the subject of this suit.  *See* 28 U.S.C. § 1391.

### A.  Legal Standard

Defendant bears the burden of establishing that venue is improper.  *Amphion Inc. v. Buckeye Elec. Co.*, 285 F. Supp. 2d. 943, 945 (E.D. Mich. 2003) (Gadola, J.) (citing 17 James Wm. Moore *et al.*, Moore's Federal Practice ¶ 110.01 (3d ed.1997)).

In a diversity action, venue must be proper under 28 U.S.C. § 1391(a), which states:

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391 (a).

### B.  Analysis

In the present case, because Defendant Ned Noretto resides in Oregon, venue would clearly be proper in the District of Oregon under 28 U.S.C. § 1391(a)(1).  However, just because venue is proper in that district, does not mean that it is not proper in another district; venue can be proper in more than one district. *See*, *e.g.*, *Overland, Inc. v. Taylor*, 79 F. Supp. 2d 809, 811 (E.D. Mich. 2000) (Gadola, J.) ("Venue may be proper in more than one judicial district under section 1391.").

Therefore, the Court must determine whether venue is also proper in the Eastern District of Michigan.

For venue to be proper in the Eastern District of Michigan, this district must be shown to satisfy the requirement of 28 U.S.C. § 1391(a)(2). That is, this district must be the location of a substantial part of the events or omissions giving rise to the claim or the location of a substantial part of the property that is the subject of the action.

In the present case, because Defendant bears the burden of establishing that venue is improper, *see* Moore's Federal Practice ¶ 110.01, Defendant must demonstrate that (1) no substantial part of the events giving rise to this claim occurred in the Eastern District of Michigan and that (2) no substantial part of the property that is the subject of the action is located in the district. *See* 28 U.S.C. § 1391(a)(2). In articulating the meaning of "substantial part," the United States Court of Appeals for the Sixth Circuit has stated that "this includes any forum with a substantial connection to the plaintiff's claim." As this Court has previously recognized, § 1391(a)(2) "does not require venue in the district with *the most* substantial contacts to the dispute. Rather, it is sufficient that *a substantial part* of the events occurred in the challenge venue, even if a greater part of the events occurred elsewhere." *Amphion, Inc.*, 285 F. Supp. 2d at 946 (emphasis added)(quoting *Greenblatt v. Gluck*, 265 F. Supp. 2d 346, 352 (S.D.N.Y. 2003) (citations omitted)). Thus, even if a majority of the events occurred in the District of Oregon, venue can still be proper in the Eastern District of Michigan if there is a substantial connection or contact between the subject matter of this case and this district.

In this case, for reasons parallel to those discussed in the personal jurisdiction analysis conducted above, the Court finds that there is a substantial connection between the events and

property giving rise to this cause of action and the Eastern District of Michigan.  In particular, Defendant sought and gained employment with a company headquartered in Michigan.  Defendant's employment required that he report directly to supervisors working in this district, and that he attend training in this district.  Both actions, Kelly maintains, provided Defendant with the confidential information and trade secrets now at the center of this litigation.  Additionally, Defendant acquired information subject to this suit by using Kelly's Michigan based servers.  Finally, as part of Defendant's employment, he entered into a non-compete, non-solicit, and non-disclosure agreement with the Michigan company. It is that Agreement that is now central to this dispute.

Although it is clear that there may be substantial events that occurred in Oregon that are relevant to this dispute, the facts indicate that "a substantial part of the events" and the property at the heart of the dispute are centered in the Eastern District of Michigan.  Accordingly, Defendant has not met his burden of demonstrating that venue is improper; venue is proper in this district and the Court will deny Defendant's motion to dismiss or transfer the action.

## V.    Preliminary Injunction

### A.  Legal Standard

The decision of whether or not to issue a preliminary injunction lies within the sound discretion of the district court. *Golden v. Kelsey-Hayes*, 73 F.3d 648, 653 (6th Cir. 1996), cert. denied, 519 U.S. 807 (1996).  The Supreme Court and the Sixth Circuit have noted that "the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc*., 119 F.3d 393, 400 (6th Cir. 1997).  *See also Ramik v. Darling Intern., Inc*. 161 F. Supp. 2d 772, 778 (E.D. Mich. 2001) (Gadola, J.) ("The purpose of a preliminary

injunction is to preserve the status quo for trial.").  The Sixth Circuit, however, has advised that "a preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted). Additionally, this "extraordinary" remedy "should best be used sparingly."  *Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.*, 966 F. Supp. 540, 541 (E.D. Mich. 1997) (Gadola, J.) (citations omitted).

When considering whether to grant the "extraordinary" remedy of a preliminary injunction, a district court must consider and balance four factors: (1) whether the moving party has a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable injury without the preliminary injunction; (3) whether issuance of the preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the preliminary injunction. *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) (citations omitted); *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 460 (6th Cir. 1999); *Blue Cross & Blue Shield Mutual of Ohio v. Columbia/HCA Healthcare Corp.*, 110 F.3d 318, 322 (6th Cir. 1997); *DeLorean Motor Co. v. DeLorean*, 755 F.2d 1223, 1228 (6th Cir. 1985).  These four factors "are factors to be balanced, not prerequisites that must be met."  *Hamad v. Woodcrest Condo. Ass'n,* 328 F.3d 224, 230 (6th Cir. 2003) (citation omitted).  A district court must make specific findings concerning each of the four factors unless fewer are dispositive of the issue.  *Performance Unlimited v. Questar Publishers, Inc*., 52 F.3d 1373, 1381 (6th Cir. 1995);  *Jones*, 341 F.3d at 476 (citations omitted) (a court "is not required to make specific findings concerning each of the four factors used in determining a motion for a preliminary injunction if fewer factors are dispositive of the issue.").

**B.      Analysis**

Kelly maintains that it is likely to succeed on the merits of the action against Noretto for the breach of the Agreement because Noretto has misappropriated Kelly's trade secrets and violated the terms of the Agreement when he began working for Volt, a direct competitor of Kelly, in the same geographic market area as Noretto was responsible for when he was employed with Kelly. Additionally, Kelly asserts that Noretto violated the Agreement when, while working for Volt, he had contact with a customer with which Noretto had significant contact with while employed with Kelly. Furthermore, Kelly contends that because of the information possessed by Defendant as a result of his managerial position, he has violated the MUTSA in using that information for his benefit and the benefit of Volt.

Defendant maintains that Kelly is not likely to succeed on the merits of this suit. Defendant readily admits that he voluntarily resigned from Kelly, but he argues, he resigned from Kelly only because he was in imminent danger of being fired. Defendant also admits that he performed certain specific work for the Plaintiff in segments of the geographic area as alleged by Plaintiff. Defendant argues however, that he has taken no action to utilize any "secret information" or customer lists to further the interests of himself or his new employer. Furthermore, Defendant argues that it is unreasonable that he be prevented from working within the staffing industry considering that there are more than 200 competitors of Kelly within the geographic area alleged. Defendant argues that because he has more than twenty-one years of experience in the field it would be unduly burdensome to force him to find other employment.

With the above legal standard in mind, the Court now undertakes an analysis of each of the factors for a preliminary injunction based upon the facts as presented to the Court.

## 1.     Strong Likelihood of Success on the Merits

### a.     Non-Compete Agreement

In the present case, Defendant has not disputed the existence of the Agreement or its non-compete clause, non-solicit, or non-disclosure clauses. Therefore, the Court need not examine the validity of the Agreement's existence or its facial applicability to Defendant.  The Court therefore focuses its inquiry on whether the non-compete clause is applicable to Defendant under Michigan law.  Under Michigan law, a non-compete agreement is enforceable as long as: (1) it is reasonably drawn as to its duration, geographical scope, and line of business; and (2) it protects the legitimate business interest of the party seeking its enforcement. *Lowry Computer Products, Inc. v. Head*, 984 F. Supp. 1111, 1113 (E.D. Mich. 1997) (Gadola, J.)

The Court begins by examining whether the Agreement is reasonably drawn in terms of its geographic and temporal restriction.  Under the Agreement, Noretto is restricted from competing with Kelly and from soliciting Kelly's customers and employees for a period of one year from the termination of his employment, within the geographic market area in which he worked or had responsibility during the last five years of his employment with Kelly.   There is no dispute that Noretto held responsibility for Multnomah, Clackamas, Washington, Columbia, Clatsop, Marion, Yamhill, Linn, Tillamook, Lincoln and Wasco counties in the State of Oregon, as well as Clark, Skamania, and Cowlitz counties, in the State of Washington.

Courts within Michigan have consistently held that non-compete agreements with one-year durations– such as the one at issue here– are reasonable and enforceable. *See, e.g., Lowry*, 984 F. Supp. at 1116 (finding a one year restriction reasonable and emphasizing that "as to duration, courts have upheld time periods of six months to three years."); *Briston Window & Door, Inc. v.*

*Hoogenstyn*, 650 N.W.2d 670 (Mich. Ct. App. 2002) (enforcing a three-year, statewide non-competition agreement). Accordingly, the Court finds that the duration of the Agreement is reasonable.

Turning to the geographic restriction contained in the Agreement, the Court finds that the restriction is not unreasonable given the facts of the case. Kelly Services, Inc. is an international corporation with broad business interests in each of the areas it services. However, the agreement limits Noretto only from working for a direct competitor in the specific geographic area in which he worked or had responsibility during the last five years of his employment. In the present case, Noretto would be limited from working for a competitor of Kelly only within certain specific counties of Oregon and Washington. Such a geographic restriction, given the vast scope of Kelly's business interests, is not inherently unreasonable.

Next, turning to the second factor, whether the non-compete agreement protects the legitimate business interests of the moving party, the case law strongly supports the conclusion that Kelly has a legitimate business interest in restricting its former employees from soliciting its customers and in protecting confidential and proprietary information such as customer lists, profit margins, corporate strategies, and pricing schemes. *See Lowry Computer Products, Inc.*, 984 F. Supp. at 1116; *Superior Consultant Co., Inc. v. Walling*, 851 F. Supp. 839, 847-48 (E.D. Mich. 1994); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran*, 67 F. Supp. 2d 764, 775 (E.D. Mich. 1999). Accordingly, Plaintiff has presented a strong likelihood of success on the merits its claim under the Agreement.

### b. Michigan Uniform Trade Secrets Act

Plaintiff has also sought relief under the Michigan Uniform Trade Secrets Act ("MUTSA"),

M.C.L. § 445.1901, *et seq*., a statute that explicitly provides for injunctive relief. *See* M.C.L. §

445.1903(1); *CMI Int'l., Inc. v. Intermet Int'l Corp*., 649 N.W.2d 808, 813 (Mich. Ct. App. 2002)

(finding that, under MUTSA, "A court can enjoin actual or threatened misappropriation of a trade

secret and can also compel affirmative acts necessary to protect a trade secret." (citations omitted)).

Information constitutes a protectable trade secret under the MUTSA if the information derives

independent economic value from not being generally known to others and the employer took

reasonable steps to protect the confidentiality of the information. *See* M.C.L. § 445.1902. Courts

have found that information such as a brokerage firm's customer lists were trade secrets for the

purpose of MUTSA. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran*, 67 F. Supp. 2d 764,

775 (E.D. Mich. 1999). Although Defendant correctly notes that this very Court, in *Raymond James*

*& Assoc. v. Leonard & Co.*, 411 F. Supp. 2d 689, 697-98 (E.D. Mich. 2006)(Gadola, J.), previously

found that customer lists were *not* trade secrets under the MUTSA, the case of *Raymond James* is

factually distinct from the present one.

      In *Raymond James*, the defendant was a former employee of the plaintiff brokerage firm.

Upon resignation, the defendant immediately began soliciting clients that he had formerly served

while employed with Raymond James. The defendant in *Raymond James* then began to service

those customers accounts under his new employer. In that case the Court found that the plaintiff was

not likely to succeed on the merits of its MUTSA claim for protection of the customer lists as trade

secrets. *Id.* at 698. However, distinct from the facts of this case, the customer lists in *Raymond*

*James* were actually created and maintained by the defendant. Therefore the Court found that the

lists were not the trade secrets of the brokerage firm. Furthermore, the plaintiff in *Raymond James*

failed to take reasonable efforts to maintain the secrecy of the information at issue. *See Raymond*

*James*, 411 F. Supp. 2d at 693-94.  Finally, the defendant in *Raymond James* was not subject to a non-compete, non-disclosure, or non-solicit contract.  *See Raymond James*, 411 F. Supp. 2d at 696.

In the present case, Defendant is allegedly subject to a non-compete, non-disclosure, and non-solicit Agreement.  Plaintiff seeks protection of its customer and prospective customer lists among other sensitive information such as its regional pricing policies and profit margins, specific details of its customer contracts and Kelly's strategic plans and marketing plans.  Defendant acquired or was given access to this information by Kelly through his position as a manager with the company.  Unlike *Raymond James* however, Defendant makes no claim that he acquired personal ownership over any of this information.  Accordingly, the rationale used to exclude the customer lists at issue in *Raymond James* is inapplicable in this case.

Defendant also argues the Plaintiff cannot prevail on a MUTSA claim because all of the information central to this suit was made available to Defendant through his employment and was readily available to every Kelly Services employee.  Therefore, Defendant maintains, the information was not subject to reasonable efforts by Plaintiff to protect its confidentiality.  The court finds  these arguments untenable at this stage of the proceedings for several reasons.  First, the fact that the information was made available to Defendant through his employment is of no assistance to Defendant's claims.  It is the fact that Defendant had access to this information through his employment and position– *and not other means*– that places it under the MUTSA.  *See* M.C.L. § 442.1902(d); *Raymond James*, 411 F. Supp. 2d at 694; *Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 614-15 (Mich. 1984).  Second, Defendant's contention that the information at issue is readily known by, and available to, all the Kelly employees is unpersuasive.  Defendant was a regional manager for Kelly, responsible for a multi-county area of both Washington and Oregon.  Defendant admits

that immediately preceding his departure from employment with Plaintiff, he closed a deal worth six-million dollars. Such facts indicate that Defendant had significant responsibility while employed with Kelly. Kelly has attested that access to information within the company is limited according to the position of the employee and that access is provided only on a need-to-know basis through its password protected system. Accordingly, the Court finds that Plaintiff has presented sufficient information supporting its contention that the information constitutes protectable trade secrets that it took reasonable steps to protect. *See* M.C.L. § 445.1902.

Therefore, based upon the facts as now presented to the Court, it appears there is a substantial likelihood that Plaintiff will succeed in proving that Noretto violated the terms of the Agreement and violated the Michigan Uniform Trade Secrets Act. Plaintiff has satisfied the first prong of the preliminary injunction analysis.

## 2. Irreparable Harm

Kelly argues that it will suffer irreparable harm if a preliminary injunction is not granted because Noretto will continue to use Kelly's confidential information and trade secrets in violation of his contractual responsibilities to Kelly. The Court agrees.

It is well settled in the Sixth Circuit that "[a]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). The loss of goodwill from existing and prospective customers has been held to be irreparable by the Sixth Circuit. *Id.* at 512. ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."); *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001). "Similarly, the loss of fair competition that results from the breach of a non-competition

covenant is likely to irreparably harm an employer." *Basicomputer Corp.*, 973 F.2d at 512 (citing *Overholt Crop Ins. Serv. Co. v. Travis,* 941 F.2d 1361, 1371 (8th Cir. 1991) (holding that irreparable harm can be inferred from insurance sales representatives' breach of non-competition covenant)).

In this Court's estimation, it is entirely unreasonable to expect Noretto to work for a direct competitor in a position similar to that which he held with Kelly, and forego the use of the intimate knowledge of Kelly's business operations. *See Lowry*, 984 F. Supp. at 1116 (Defendant's knowledge is "bound to have significant adverse impact on [Plaintiff's] business."); *Walling*, 839 F. Supp. at 847-48 (finding that "use of this knowledge [confidential client information] would enable [Defendant] effectively to undercut [Superior's] rates while providing the same services provided by [Superior].").  Absent an order for preliminary injunction, it appears that Defendant's expansive knowledge of Kelly's business systems and operations will result in a loss of the customer goodwill developed by Kelly.  Furthermore, Kelly will be forced to labor under the burden of unfair competition as a result of the informational asymmetry presented by its direct competitor having an employee with intimate knowledge of its operations.  Because the resulting losses suffered by Kelly are so indefinite and speculative in scope, the harm is irreparable.  *See*, *Chem-Trend v. McCarthy*, 780 F. Supp. 463 (E.D. Mich. 1991); *Walling*, 851 F. Supp. at 847; *Basicomputer Corp*., 973 F.2d at 511-12.  As a result, Plaintiff has satisfied the second prong of the preliminary injunction analysis.

### 3.  Whether there will be Substantial Harm to Others

An inquiry into whether there will be substantial harm to others is a fact-based inquiry. *Curtis 1000, Inc. v. Martin*, 197 Fed. App'x. 412, 426 (6th Cir. 2006).  In the present case, Defendant has not presented any credible evidence that there will be substantial harm to the general public.  Indeed, as discussed below, the general public appears to have a strong interest in the

issuance of preliminary injunction in the present situation.

In consideration of this factor, the Court has also considered the harm that may be inflicted upon Defendant by the issuance of a preliminary injunction. *See Curtis 1000, Inc.,* 197 Fed. App'x. at 426 (finding that the term "others" may include the defendant). The Court recognizes that if the injunction requested by Plaintiff is issued, Defendant will be unable to continue in his current position with Volt within the Portland office for the remainder of the term set forth in the Agreement or until this case is otherwise resolved in his favor. However, Defendant's potential harm is substantially mitigated for several reasons. First, under the terms of the agreement, the restriction on Defendant's employment with direct competitors is limited to the geographic area in which he held responsibility while with Kelly. Defendant is not restricted from working for a direct competitor, such as Volt, if his employment does not encompass any of the geographic region for which he was responsible in his employment with Kelly. Accordingly, although Defendant admits he has until now restricted his job search to the Portland area because he does not want to move his family, Defendant could comply with the terms of the Agreement and substantially mitigate any harm by simply by moving to a different geographic area. Additionally, Defendant could mitigate any potential harm simply by seeking employment in another industry. Defendant's testimony indicates during the course of his employment he has been a successful and self-motivated employee that has been able to rise through the ranks of various corporations. Under the terms of the agreement Defendant is unrestricted in applying his skill set to any position outside of the staffing industry, whether the position is located in his preferred location of Portland, Oregon or anywhere else. Finally, the restrictions Defendant now argues are unduly burdensome are those terms that he agreed to as part of his employment with Kelly. The Court is reluctant to find that terms Defendant

*voluntarily* agreed to in an effort to secure a position with Kelly are now unduly burdensome simply because he chose to resign from Kelly.

In summation, although the Court is sympathetic to Defendant's desire to retain his position with Volt in the Portland office, and to refrain from uprooting his family from the area, given the facts of the case as now presented to the Court, the Court is unable to reconcile Defendant's desires with the applicable law. Phrased another way, although Defendant may not be able to pursue his first choice with respect to an employment position or location, Defendant can readily comply with the terms of the Agreement and find a suitable employment position. Therefore, absent any demonstration of any harm to the public, and given that Defendant can substantially mitigate any potential harm that he may incur, the Court finds that Plaintiff has satisfied the third prong of the preliminary injunction analysis.

### 4. Whether the Public Interest will be Served by a Preliminary Injunction

The Court finds that this factor weighs heavily in favor of Plaintiff. It is axiomatic that the public has an interest in the enforcement of the legislatively enacted laws. Such an interest surely extends to the enforcement of the Michigan Uniform Trade Secrets Act, an act that prevents disclosure of trade secrets and explicitly provides for injunctive relief in instances of actual or threatened misappropriation of trade secrets. *See* M.C.L. § 445.1903(1); *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 813 (Mich. Ct. App. 2002). Additionally, there can be little doubt that public has a substantial interest in the enforcement of valid contractual obligations. *See, e.g. Walling*, 851 F. Supp. at 848. In the present case, Defendant readily admits that he was in violation of the Agreement's provision prohibiting him from associating with a direct competitor of Kelly for one year following his resignation. Based on such considerations, the Court finds that Plaintiff has

satisfied the fourth prong of the preliminary injunction analysis.

Therefore, cognizant that the "extraordinary" remedy of a preliminary injunction should be used sparingly, *Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.*, 966 F. Supp. 540, 541 (E.D. Mich. 1997) (Gadola, J.) (citations omitted), after a full consideration of the facts as presented to the Court and a careful consideration of each of the four factors necessary for a preliminary injunction, the Court finds that Plaintiff has carried its burden. The circumstances as demonstrated to this Court clearly demand that a preliminary injunction be issued, *Overstreet v. Lexington-Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted), so that the relative positions of the parties can be preserved until a trial on the merits can be held. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997).

## VI.     Bond

Finally, Rule 65 of the Federal Rules of Civil Procedure requires that:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c) (emphasis added).

Application of Rule 65(c) has been construed by the Sixth Circuit as being within the sound discretion of the trial judge. *Urbain v. Knapp Brothers Manufacturing Co.*, 217 F.2d 810 (6th Cir. 1954). However, failure to consider the question of security has been considered error by the Sixth Circuit. *Beukema's Petroleum Co. v. Admiral Petroleum Co.*, 613 F.2d 626, 629 (6th Cir. 1979).

The sum posted on bond should reflect the damages that may be incurred by a wrongfully enjoined party. Fed. R. Civ. P. 65(c). In the present case, Plaintiff posted a bond of $10,000 upon

issuance of the initial temporary restraining order. When considering the amount of the bond necessary at that time, the Court reasoned that because Defendant would not suffer total deprivation of his ability for gainful employment but would only suffer some potential diminution of wages based upon the temporary nature of the initial injunctive relief, the Court found a bond of $10,000 appropriate.

Now, Defendant is facing an injunction of much longer duration and a bond of a more substantial sum is appropriate. After consultation between the parties, each side agreed that a total bond of $50,000 is appropriate. The Court agrees and will order Plaintiff Kelly Services, Inc., to post an additional $40,000 bond, in addition to the $10,000 already posted, as security for the preliminary injunction.

## VII. Conclusion

**ACCORDINGLY, IT IS HEREBY ORDERED** that Defendant Noretto's motion to dismiss for lack of personal jurisdiction [docket entry #11] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Noretto's motion to dismiss or transfer for improper venue [docket entry #11] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Kelly Services, Inc., is granted a preliminary injunction, **EFFECTIVE IMMEDIATELY** and **REMAINING IN EFFECT** until **MAY 4, 2008** or until this matter is otherwise resolved by the Court**.**

**IT IS FURTHER ORDERED** that Defendant **NED NORETTO** is **ENJOINED** from **directly or indirectly**:

(a) working for, or acting as, an employee, partner, stockholder, investor, owner, director, agent, or consultant for a competitor of Kelly (including, but not

limited to, Volt) within Multnomah, Clackamas, Washington, Columbia, Clatsop, Marion, Yamhill, Linn, Tillamook, Lincoln and Wasco Counties, in the State of Oregon and Clark, Skamania, and Cowlitz Counties in the State of Washington;

(b) soliciting or performing services for any Kelly customer for a competing business;

(c) soliciting or being involved in the recruitment or hire of any Kelly employee for a competing business (including but not limited to Volt) until;

(d) using or disclosing any of Kelly's confidential, proprietary or trade secret information or property;

(e) interfering, in any way, with any current or prospective customer or employee relationship of Kelly;

(f) disclosing or using Kelly's confidential or proprietary information.[2]

**IT IS FURTHER ORDERED** that Defendant return all Kelly property now in his possession to Kelly, no matter what form that property is maintained, no later than Thursday, July 19, 2007.

**IT IS FURTHER ORDERED** that Defendant must **PRESERVE** all evidence, including hard copies, electronic, computer or any other format, that relates in any way to the claims made in this case.

**IT IS FURTHER ORDERED** that Plaintiff shall post a bond of $50,000 with the Clerk of

---

[2]The Court declines to adopt the entirety of Plaintiff's proposed item (f), enjoining Defendant from breaching any fiduciary obligations or duties owed to Plaintiff, because Plaintiff has not presented any argument related to that relief. Nevertheless, the Court's failure to adopt that language should not be construed by any party as a grant of authority to violate any other term of this order or of the Agreement.

the Court, no later than close of business, Friday, July 13, 2007. The Court duly recognizes that Plaintiff previously posted bond in the amount of $10,000 with the Clerk of the Court upon issuance of the June 6, 2007 Temporary Restraining Order. Accordingly, Plaintiff need only post an additional bond in the amount of $40,000 to satisfy the $50,000 total amount now required by the Court. The total bond of $50,000 shall **REMAIN IN EFFECT** until the automatic dissolution of the preliminary injunction on May 4, 2008, or until this matter is otherwise resolved.

**SO ORDERED.**

Dated:    July 9, 2007          s/Paul V. Gadola
                                HONORABLE PAUL V. GADOLA
                                UNITED STATES DISTRICT JUDGE

---

Certificate of Service

I hereby certify that on    July 10, 2007    , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:    James J. Giszczak; Katherine D. Goudie; Kirk M. Liebengood                , and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:                                              .

                                s/Ruth A. Brissaud
                                Ruth A. Brissaud, Case Manager
                                (810) 341-7845